# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SMJ&J, INC. | : |
| | : |
| **Plaintiff** | : |
| v. | : **3:11-CV-0008** |
| | : **(JUDGE MARIANI)** |
| NRG HEAT & POWER, LLC | : |
| | : |
| | : |
| **Defendant** | : |

## MEMORANDUM AND ORDER

### I. Introduction and Procedural History

Plaintiff SMJ&J, Inc. ("SMJ&J") filed a Complaint (Doc. 1) against Defendant NRG

Heat & Power, LLC ("NRG") seeking, *inter alia*, injunctive relief for NRG's alleged violations

of the Lanham Act, 15 U.S.C. § 1125(a), Pennsylvania Trademark Act, 54 PA. CONS. STAT. §

1124, and for common law unfair competition. NRG counterclaimed (Doc. 5) under the

Lanham Act and common law trademark infringement.

Judge Munley granted the parties' motion to bifurcate the issues of liability and

damages. (Doc. 15). The parties then filed cross-motions for partial summary judgment on

January 27, 2012 (Docs. 19, 20). Plaintiff asserted that it was entitled to operate within

Hunterdon, Morris, Warren and Sussex Counties in New Jersey to the exclusion of

Defendant, and Defendant argued that it was entitled to operate within Monroe, Lehigh, and

Northampton Counties in Pennsylvania to the exclusion of Plaintiff. The motions have been

fully briefed and are ripe for review.

## II. Statement of Facts[1]

### A. Plaintiff's Business History

SMJ&J is a corporation organized under the laws of Delaware and registered to do business in Pennsylvania. (Wenger Aff., Doc. 19, Ex. 1, ¶ 4). Don Wenger, SMJ&J's sole shareholder and President, formed SMJ&J in 1994, and its corporate offices have been in Phillipsburg, New Jersey (Warren County) since 1997. (Wenger Dep., Doc. 19, Ex. 2, 6:15-18; 8:6-8). SMJ&J was created to purchase the assets of a home heating oil delivery business then owned and operated by one, Carl Cooper, Sr. (Wenger Dep., 8:6-12; Wenger Aff. ¶¶ 6-7). SMJ&J memorialized the asset purchase in a written agreement dated October 17, 1994. ("SMJ&J-Cooper Agreement," Wenger Aff., ¶ 10, Ex. A). The agreement covered Cooper's logos, including "Cooper's Sales and Service," "Cooper's Oil Company," and "Liberty Discount Fuel" ("Liberty Discount") (SMJ&J-Cooper Agreement, at ¶ 1.01). Cooper had split Cooper's Sales and Service into Cooper's Oil, the full-service side, from Liberty Discount, the discount side, sometime in the mid-1980s. (Cooper Dep., Doc. 19, Ex. 3, at 19:23-20:12) ("It's only a guess, mid '80s.").

### Cooper's Advertisements in Pennsylvania and New Jersey

Cooper testified that he had advertised Liberty Discount Fuel in the *Easton Express-Times* (Northampton County), the *Morning Call*,[2] some publications in Bangor, Pennsylvania

---

[1] This opinion will cover the undisputed statements of fact only with respect to the counties at issue in the parties' respective motions for partial summary judgment. Therefore, it will not address areas of Pennsylvania outside of Monroe, Lehigh, and Northampton Counties or areas of New Jersey outside of Hunterdon, Morris, Sussex, and Warren Counties.

2

(Northampton County), and in some other newspapers in northern New Jersey. He did "very little" radio and television advertising for the Monroe and Northampton County areas and no advertisements at Monroe County fairs. (Id. at 27:2-20). SMJ&J also submitted an invoice for $403 dated December 7, 1999 from the Treasure Hunt, a Phillipsburg, New Jersey ad publication. (Doc. 19, Ex. 1C). An undated advertisement indicates that Liberty Discount Fuel served Belvidere, Blairstown, Clinton, and Alpha, New Jersey.[3] (Doc. 19, Ex. 1D).

## Scope of Cooper's Home Heating Oil Business in Pennsylvania and New Jersey

According to Cooper, the geographic scope of business he covered was:

heavy into the Blairstown, Belvidere, New Jersey area. I got into Sussex County a little bit, . . . and then got very rarely into the Stroudsburg [Monroe County] area, was pretty heavy in the Bangor area [Northampton County]. And then we thinned out, as we got over towards Lehighton [Carbon County] and that area. . . . [W] were pretty good into Allentown [Lehigh County] and just a couple miles north of Allentown. . . . We got down into Quakertown [Bucks County], not real heavy, . . . We got into Flemington, New Jersey, and a little bit into the Clinton area, not further.

(Id. at 35:16-36:8). Cooper later clarified that he would go about seven or eight miles north of and fifteen or twenty miles west of Bangor. (Cooper Dep., Doc. 23, Ex. 4, at 57:9-21). There were many customers in Northampton County on Cooper's customer list when he sold to SMJ&J in 1994, and there may have been some increased activity in Monroe County. (Id. at 37:14-19). Cooper's Oil also operated in Monroe County from the early

---

[2] The *Morning Call* website indicates its readership is in Allentown (Lehigh County) and Lehigh Valley (region consisting of Lehigh, Carbon, and Northampton Counties and Warren County, New Jersey).

[3] Warren and Hunterdon Counties.

3

1970s through 1994, though Cooper may have served fifty customers or fewer there. (Cooper Dep., 19:2-17).

Before Cooper sold his assets to SMJ&J in 1994, he had operated both Cooper's Oil Company and Liberty Discount Fuel in New Jersey. (Wengerd Dep., 12:18-23). Liberty Discount Fuel had operated heavily in Warren County and sparsely in Sussex County. (Cooper Dep., Doc. 19, Ex. 3, 35:16-36:1).

## SMJ&J's Operations through Liberty Discount

SMJ&J registered the fictitious name, "Liberty Discount Fuel," with the states of Pennsylvania and New Jersey in 1995 and continued Liberty Discount Fuel's operation in New Jersey, specifically Warren, Morris, and Hunterdon Counties. (Wenger Dep. 20:3-9; Wenger Aff. at ¶¶ 5, 14). Wenger denied having any knowledge of NRG's Liberty Oil Company prior to his transaction with Cooper in 1994, and though he did not research trademarks, he made "sure that there was no one else in our marketplace that sold under Liberty Discount." (Wenger Dep. at 25:14-26:6).

Liberty Discount's accounts in Lehigh, Monroe, and Northampton Counties number more than 11,000. (Wenger Aff., Doc. 23, Ex. 8, ¶¶ 11, 14, Ex. B). The customer list attached to Wenger's affidavit is undated, but it appears from Wenger's statement that the list is current as of February 2012 ("The attached list of more than 11,000 accounts in Pennsylvania[4] also is a direct result of SMJ&J's efforts over the last several years to market

---

[4] Though Wenger stated there were more than 11,000 accounts in Pennsylvania, Exhibit B appears to list counties only in Lehigh, Monroe, and Northampton Counties, the counties at issue in NRG's motion.

4

this trademark in these areas." ¶ 14). SMJ&J also produced a list of Liberty Discount customers in New Jersey dated January 9, 2012. (SMJ&J New Jersey Customer List, Doc. 19, Ex. 1B). A handwritten notation indicates that as of the date of printing, Liberty Discount had 10,120 accounts in New Jersey.[5]

## Liberty Discount's Use of the Statue of Liberty Logo

At the time of Liberty Discount's sale to SMJ&J, Liberty Discount's trucks did not bear a logo of the Statue of Liberty. (Cooper Dep., Doc. 20, Ex. 25, at 24:12-20). Cooper also stated that he did not remember a time between 1994 and 1996,[6] when the Statue of Liberty was used as a logo for either Cooper's Oil or Liberty Discount. (Id. at 25:21-26:1). A photograph of a Liberty Discount Fuel truck purportedly taken in January 1997 shows the business name as Liberty Oil without a depiction of the Statue of Liberty. (Doc. 20, Ex. 27).

Though the exact date when SMJ&J began using the Statue of Liberty in conjunction with the trade name Liberty Discount Fuel is unclear, it was no later than 1999 or 2000. (Deemer Aff., Doc. 19, Ex. 4, ¶¶ 4-6). At least from June 2001 onward, SMJ&J advertised Liberty Discount Fuel with a depiction of the Statue of Liberty, which was orange, white, and blue. (Cospito Aff. ¶¶ 11-12, 15-17, 19, Ex. A; Cospito Dep. Doc. 19, Ex. 6, 5:15-19; 9:14-21; 24:25-26:2). These advertisements appeared in various weekly ads in Warren and Hunterdon Counties, and the Yellow Pages for Warren, Hunterdon, and Morris Counties in

---

[5] NRG contends that though Wenger's Affidavit says the Customer List represents Liberty Discount Fuel customers, it is unclear whether these accounts belong to SMJ&J, Inc. or to SMJ&J operating as Liberty Discount Fuel.

[6] The period of time he stayed on with SMJ&J.

New Jersey.[7] (Cospito Aff., Ex. A). SMJ&J also used Liberty Discount Fuel and the Statue of Liberty on its website to advertise its services were available in New Jersey. (Cospito Aff., ¶ 17, Ex. B). All of the Liberty Discount's trucks delivering to New Jersey currently have the name "Liberty Discount Fuel" and a depiction of the Statute of Liberty on their tanks. (Cospito Aff. ¶ 18).

Wenger states he learned of Liberty Oil's existence sometime in 1999 or 2000. (Wenger Dep., 28:16-22). Upon learning that Liberty Oil might be available for purchase, he instructed his general manager to approach NRG to inquire whether NRG was interested in selling Liberty Oil to SMJ&J, but the response was negative. (*Id.* at 28:23-29:10; *see also* Wenger Aff. ¶¶ 24-27).

### B. Defendant's Business History

Liberty Oil Company, Inc. ("Liberty Oil") was formed and incorporated in Delaware in 1925, and the documents of incorporation indicate that the purpose of Liberty Oil was, among others, "[t]o mine, dig for, or otherwise obtain from the earth," oils and natural gas, "to manufacture, refine, prepare for market, buy, sell, and transport the [illegible] in the crude or refined condition; . . . and to sell and supply the same to others." (Doc. 20, Ex. 1, ¶ 3). Rita Lotz, the eventual president of Liberty Oil, testified that when she joined the company in 1946 Liberty Oil was in the business of delivering, among other things, home heating oil. (Lotz Aff., Doc. 20, Ex. 2, ¶¶ 2, 9). During her career at Liberty Oil, the

---

[7] Don Wenger stated that SMJ&J spent in excess of $15,000 in advertising each year in Hunterdon, Warren, and Morris Counties since 1994, but there is no documented evidence to support this statement. (Wenger Aff. ¶ 20).

company's sales were primarily in Schuylkill and Carbon Counties, but Liberty Oil did make sales in Monroe, Northampton, and Berks Counties. (*Id.* at ¶ 7). When Lotz began her career with Liberty Oil, Liberty Oil's letterhead depicted the full image of the Statue of Liberty. (*Id.* at ¶ 3; *see also* Doc. 20, Ex. 12). Liberty Oil advertised for special occasions at churches and sponsored contestants at winter carnivals. (Lotz Aff., at ¶ 11). The precise geographic scope of the advertising is unclear.

In 1986, Darnek Inc., a business which Norwood Klotz co-owned, purchased Liberty Oil. (Lotz Aff., at ¶ 8; Klotz Aff., Doc. 20, Ex. 3, 8:18-20). After the purchase, Klotz acted as Secretary-Treasurer and COO. (Klotz Aff., at 12:24-13:2). When Klotz purchased the company, Liberty Oil's business was 90% number 2 residential home heating oil and 10% gasoline, including wholesale fuel oil. (*Id.* at 8:23-9:11). During his tenure, Liberty Oil's main office was in Port Carbon, Pennsylvania (Schuylkill County), and its satellite office was in Lehighton, Pennsylvania (Carbon County). (*Id.* at 9:21-10:5).

On October 5, 2007, Klotz executed a written asset purchase agreement with NRG, a New York limited liability company doing business in Pennsylvania,[8] for Liberty Oil. ("Liberty Oil-NRG Asset Purchase Agreement" Doc. 20, Ex. 23; Pipolo Dep., 23:24-25; 29:8-13; 33:10-12; 44:19-21). The agreement stated that Liberty Oil was located in Lehighton, Pennsylvania (Carbon County) and also operated in Port Carbon, Pennsylvania (Schuylkill County). In addition to client files and the exclusive right to sell and service the seller's

---

[8] (Cirillo Dep., Doc. 19, Ex. 12, 11:15-17; Pipolo Dep, Doc. 19, Ex. 13, 15:18-20; Doc. 5, ¶¶ 5-8). Nick Cirillo and Guy Pipolo are the sole members of NRG, and they formed NRG in 1998 or 2000. (Cirillo Dep. at 11:18-20; 10:10-12; Pipolo Dep. 8:18-23; 10:7-11).

customers, the agreement granted NRG the right to use the name "Liberty Oil." The seller no longer had the right to continue using the name except for the purpose of liquidating its remaining assets.

## Liberty Oil's Use of the Statue of Liberty Logo

Klotz testified that when he purchased Liberty Oil in 1986, it had approximately eleven delivery trucks, most of which bore "Liberty Oil Company, Inc." on their sides along with a depiction of the Statue of Liberty. (Id. at 10:11-11:3). Thereafter, any newly-purchased trucks received "mostly the same" name and logo on them. (Id. at 11:10-24).

Klotz testified that he knew "Liberty Oil used the Statue of Liberty before my time, because obviously I lived in Lehighton. And, in the late '70s I remember seeing this logo on the trucks at their office or some type of Statue of Liberty logo." (Id. at 75:24-76:3). In particular, Klotz testified that the Statue of Liberty from mid-torso and upwards was "one of the logos" Liberty Oil used in his "earlier years" of ownership. It was on "all the vehicles and lots of our ads," though the letterhead and some ads used the full statue. (Id. at 74:2-23). When he purchased Liberty Oil, the only registered mark was "Liberty Mart" for a chain of convenience stores. However, Klotz continued to use the logos and names that Lotz used. (Id. at 55:2-13). "Whether it was trademarked or not prior to my time, I don't really know, but we continued to use what was in effect at that time." (Id.).

## Liberty Oil's Advertisements in Pennsylvania and New Jersey

Klotz advertised Liberty Oil in the *Morning Call*, *Pottsville Republican*, and *Times News*.[9] (*Id.* at 12:1-13). He also advertised in the "west side of Monroe County" at the West End Fair "the second or third year [after purchasing Liberty Oil] . . . and continued there for a good number of years." (*Id.* at 70:19-71:2). The advertisements stated that Liberty Oil served 11 counties. (*Id.* at 32:25-33:25).

Klotz edited a template advertisement in approximately 1987, which listed service areas as Berks, Carbon, Columbia, Lehigh, Luzerne, Monroe, Northumberland, and Schuylkill Counties. It did not include Northampton County. (Klotz Dep. at 45:22-47:4; *see also* Template Advertisement, Doc. 20, Ex. 20). He later stated that the exclusion of Northampton County was inadvertent because Liberty Oil "definitely delivered to Northampton County," as well as Dauphin, Columbia, and Lebanon Counties, where Liberty Oil "hit on the fringes." (*Id.* at 47:11-24; 69:11-70:6).

A few years later, the *Pottsville Republican* ran an advertisement in February 1991 which stated that Liberty Oil "has been providing service to its customers for 65 years . . . . Liberty Oil has continued to grow aggressively and now serves the following counties: Berks, Carbon, Columbia, Lehigh, Luzerne, Monroe, Northumberland, and Schuylkill." (Doc. 20, Ex. 21). Again, Northampton County is absent.

Liberty Oil also had a website which set forth the types of services it provided and where. (Doc. 20, Ex. 18; Ahner Dep., Doc. 20, Ex. 19 at 27:12-24, 45:6-10; 48:3-13). Troy

---

[9] Pottsville, Pennsylvania is located in Schuylkill County and the *Times-News* circulates in and around Lehighton, Pennsylvania.

9

Ahner, who was Vice-President of Liberty Oil, indicated that Liberty was not doing any business in New Jersey. (Ahner Dep., at 48:3-13). After Klotz sold Liberty Oil to NRG in 2007, the website was upgraded to allow Liberty Oil to take online orders, to add a company history, and to change some graphic designs. (Pipolo Dep., Doc. 23, Ex. 3, 41:6-18). However, Monroe County was not added to the website as a service area until "sometime after 2010." (T. Willis Aff., Doc. 23, Ex. 2, ¶¶ 17-18). As of October 2011, Northampton County was not listed as a service area, nor were any counties in New Jersey listed. (Pipolo Dep., Doc. 23, Ex. 3, at 72:14-17; 73:9-17).

Neither has NRG promoted Liberty Oil in New Jersey via advertisements, aside from placing an ad in the Yellow Pages in Easton, Pennsylvania which spilled over into New Jersey. In its Answer, NRG specifically denied that Liberty Oil targeted customers in New Jersey. (Doc. 5, ¶¶ 19-21).

### Liberty Oil's Operations in Pennsylvania and New Jersey

Klotz testified that Liberty Oil delivered bulk heating oil to townships, municipalities, and commercial accounts, such as Traylor Hotel, in Lehigh County. (Klotz Dep., at 19:11-13). He also testified that even before he purchased Liberty Oil, it delivered to Monroe County because Klotz remembered drivers going to Saylorsburg, Sciota, Stroudsburg, and perhaps Tannersville. (Id. at 21:23-22:10, 72:11-73:12, 81:25-82:19). He received calls for heating oil in Monroe and Northampton Counties, but the volume of these calls varied from year to year. (Id. at 70:1-18, 71:8-21). However, he characterized these deliveries as

10

"minimal" in comparison to the deliveries made to Carbon and Schuylkill Counties. (Id. at 23:6-10, 69:22-25). On the other hand, numerous SMJ&J truck drivers have testified they never saw any Liberty Oil trucks in Monroe, Northampton, or Lehigh Counties until at the earliest 2010. (Hill Aff., Doc. 23, Ex. 5, ¶ 18, Willis Aff., Doc. 23, Ex. 2, ¶¶ 19, 21, Deemer Aff., Doc. 23, Ex. 7, ¶¶ 11-12).

Anna Marie Cospito, the current General Manager of SMJ&J and resident of Monroe County, stated she first became aware of Liberty Oil when she saw a billboard advertisement in 1999 at the intersection of Routes 209 and 443 (Carbon County).[10] (Cospito Dep., Doc. 20, Ex. 22, at 5:9-10; 6:9-15; 8:6-12). At the time, she moved to Monroe County, she was not working for SMJ&J or Liberty Discount. (Id. at 5:18-19). She also received Liberty Oil advertisement in the mail after she moved to Monroe County. She inquired with Liberty Oil about their services and was told Liberty Oil could provide her with service in Monroe County where she lived just east of Route 534, though "they didn't come down to that area." (Id. at 18:11-21:19).[11]

Klotz testified that he limited deliveries to 35-40 miles from his bulks plants for filling stations (Klotz Dep. at 71:25-72:8), which were located in Hazleton, Sinking Springs, Port Carbon, Lehighton, Fullerton, and Macungie. (Doc. 20, Ahner Certification, Ex. 38; Map, Ex. 40). Though Liberty Oil's fuel oil business overall declined approximately 30% from

___

[10] Pennsylvania Route 443 is an east-west state highway whose eastern terminus is at U.S. Route 209 in Lehighton, Pennsylvania (Carbon County).

[11] When asked why she would inquire after Liberty Oil's services, she stated she was unsure whether she wanted a cash-on-delivery service, such as Liberty Discount, because she wanted full service, and Cooper's Oil (full service) did not deliver to Monroe. (Id. at 20:3-10).

2000-2007, Klotz testified that Liberty Oil continued to advertise in the Morning Call and also made deliveries to Northampton and Monroe Counties. (*Id.* at 31:22-32:9, 32:10-25). He also provided to NRG a customer list dated 2000 for Lehigh, Monroe, and Northampton Counties. (Doc. 20, Ex. 32).

Guy Pipolo testified that he was not "sure about Northampton County," but he believed that Liberty Oil serviced that area prior to NRG's purchase of Liberty Oil in 2007. (Pipolo Dep. Doc. 19, Ex. 13, 75:1-9). Troy Ahner could identify only a single account in Northampton County when presented with an automatic customer list (as opposed to total customer list) dated February 3, 2008. (Ahner Dep., Doc. 23, Ex. 6, 52:10-54:6). Pipolo was sure, though, that prior to November 2007, Liberty Oil was doing business in Monroe County. (Pipolo Dep. at 75:10-14). Transaction histories provided by Troy Ahner indicate approximately thirty accounts located in Northampton County and Lehigh Counties, with the earliest dating back to 1994.[12] (Doc. 20, Exs. 35, 36).

Prior to NRG's purchase of Liberty Oil, Liberty Oil did not sell or deliver any home heating oil to New Jersey. (Klotz Dep. at 18:13-16) ("I don't believe we ever delivered to any accounts in New Jersey"). NRG likewise did not believe that Liberty Oil had done any business in New Jersey. (Cirillo Dep. at 34:5-14). Troy Ahner also confirmed at his deposition in October 2011 that Liberty Oil's website did not indicate that it served New Jersey, because it did not. (Ahner Dep., at 48:3-13). Rather, the website specifically said

---

[12] Monroe County is not included. Troy Ahner's Certification (Doc. 20, Ex. 38, ¶ 11) states that these are only partial transaction histories.

that Liberty Oil serves "Carbon, Schuylkill, Lehigh and Monroe Counties" in Pennsylvania. (*Id.*).

Sometime in 2001 or 2002, Cirillo and Pipolo also formed Clickable Oil, which also sells and delivers home heating oil. (Cirillo Dep. at 11:21-25; 12:22-24). Clickable Oil's aim was to serve customers located in the Phillipsburg, New Jersey (Warren County) and Easton, Pennsylvania (Northampton County) areas, and as of 2007, Clickable Oil had customers from Dover, New Jersey (Warren County) to Allentown (Lehigh County). (Pipolo Dep., 21:23-22:7; 29:14-30:2). After Cirillo and Pipolo divested some of Clickable Oil's assets in 2008, Clickable Oil was left with assets in "North Jersey and Pennsylvania." (Cirillo Dep. at 13:13-23).

**Meeting between Liberty Oil and Liberty Fuel Owners and Subsequent Events**

Sometime in 2008 or 2009, Nick Cirillo contacted Don Wenger and requested a meeting to discuss the possible acquisition of Liberty Discount by NRG. The two met at a Perkin's Pancake House in Phillipsburg, New Jersey, along with Howard Bock, Vice-President of SMJ&J, Guy Pipolo, and two financial advisors to NRG. (Wenger Dep. at 30:12-25; Pipolo Dep. at 45:1-24; Cirillo Dep. at 35:20-23; Wenger Aff. ¶ 31).

Don Wenger testified that at the meeting, he disclosed the success of Liberty Discount Fuel's operations in New Jersey. (Wenger Aff. ¶ 32). Guy Pipolo testified that the parties did not discuss "territory," where Liberty Discount Fuel operated and where it did business, but he left the meeting "believing that [Wenger] was willing to sell out." (Pipolo

13

Dep. at 46:10-18). Though NRG served other areas as well, Cirillo told Wenger that Liberty

Oil's business was concentrated in Lehighton and Port Carbon, Pennsylvania. (Wenger

Dep. at 31:3-9).

Before the winter of 2009-2010, Liberty Discount Fuel employees had never seen

any Liberty Oil trucks traveling or making deliveries in New Jersey. (Deemer Aff., ¶ 9; J.

Willis Aff., ¶ 9). However, starting in 2011, Liberty Oil began to deliver oil to customers in

New Jersey. (Pipolo Dep., Doc. 20, Ex. 33, at 74:1-3; Deemer Aff. ¶¶ 12-14 (Nov. 15,

2011); Hill Aff., ¶¶ 13-14, 18-19 (Oct. 2011); Cospito Aff., ¶¶ 27-34 (Jan. 20, 2011)). Guy

Pipolo stated that NRG, trading as Liberty Oil, made only "very limited sales in New Jersey"

and eventually transferred its fourteen accounts to Clickable Oil. (Pipolo Aff., Doc. 25, Ex.

2, ¶¶ 5-6, Ex. A). Occasionally, though, when a Clickable Oil truck has been unavailable to

deliver to Clickable Oil customers in New Jersey, NRG has sent a Liberty Oil truck to make

deliveries in New Jersey. (Pipolo Aff. at ¶ 7).

SMJ&J asserts that the presence of Liberty Oil and Liberty Discount trucks within the

same areas in New Jersey has caused confusion amongst its customers,[13] causing it to lose

accounts to NRG. (See, e.g., Deemer Aff., ¶¶ 12-14; Hill Aff., ¶¶ 13-14, 18-19; Cospito Aff.

¶ 26). NRG disputes SMJ&J's contention, saying that customers of home heating oil

---

[13] SMJ&J submitted an affidavit from its Office Manager, Sassy Mohammed, who swore that in 2011 she
contacted a former client (St. Patrick's Church) who had received a delivery from Liberty Oil. The "woman who
answered the phone advised that she did not know the difference between Liberty Discount Fuel and Liberty Oil
Company." (Mohammed Aff., Doc. 19, Ex. 9, ¶ 19; see also J. Willis Aff. ¶¶ 12-16; T. Willis Aff. ¶¶ 9-12). This
statement is hearsay and may not be considered by the Court. However, the proper test is whether there is a
"likelihood of confusion" rather than "actual confusion,"(see infra) so the exclusion of this statement as evidence is
unimportant to the Court's analysis.

typically research the best prices and these former Liberty Discount customers ordered from and paid Clickable Oil, and these orders were then delivered by Liberty Oil trucks. (Silano Aff., Doc. 25, Ex. 1, ¶¶ 4-8, Ex. A; Cirillo Dep., Doc. 20, Ex. 34, at 41:16-19).

## III. Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993). In this case, the parties have filed cross-motions for summary judgment. (Docs. 32, 40, 45). According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). Each movant must show that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir.2008). When reviewing each motion, the court is bound to view the evidence in the light most favorable to the nonmovant. FED. R. CIV. P. 56; *United States v. Hall*, 730 F.Supp. 646, 648 (M.D. Pa.1980).

When deciding whether to grant a permanent injunction, the district court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably harmed by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the non-moving party; and (4) the injunction would be in the public interest. *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

## IV. Analysis

Section 43(a)[14] of the Lanham Act ("Act") protects unregistered trademarks:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

---

[14] Though the citation is to § 1125(a), this portion of the Lanham Act is commonly referred to as Section 43(a) because the contents of § 1125(a) were found in Section 43(a) of Public Law 79-489 before the Lanham Act was codified. *See* 79 PUB. L. NO. 489, 60 Stat. 427 (1946).

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The Act protects unregistered marks to the same extent as registered marks because trademark rights emanate from use and not merely registration. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753 (1992) ("it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."). When the mark is unregistered, though, the parties' rights are determined according to the common law. *Laurel Capital Group, Inc. v. BT Financial Corp.*, 45 F. Supp. 2d 469, 481 (W.D. Pa. 1999).

SMJ&J moves for partial summary judgment with respect to Liberty Discount Fuel's operations in New Jersey, specifically, Hunterdon, Morris, Sussex, and Warren Counties. To prevail on a trademark infringement claim for an unregistered mark, the plaintiff must show that (1) the mark is valid and legally protectable, (2) the plaintiff owns the mark, and (3) the defendant's use of a similar mark is likely to create confusion concerning the origin of the plaintiff's goods or services. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

## A. Plaintiff's Motion for Partial Summary Judgment[15]

### 1. Is SMJ&J's mark valid?

Unlike federally registered marks, unregistered marks enjoy no presumption of

validity. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986). Trademarks

protected under the Lanham Act are divided into four categories:

> [1] arbitrary or fanciful marks that use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods. [2] Suggestive marks that require consumer imagination, thought or perception to determine what the product is. [3] Descriptive terms [that] forthwith convey an immediate idea of the ingredients, qualities or characteristics of the goods and [4] generic marks that function as the common descriptive name of a product class.

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F3d 270, 282 (3d

Cir. 2001) (citing *A&H Sportswear*, 237 F.3d 221-22 (3d Cir. 2000) (internal quotation

marks omitted). The Third Circuit has provided examples of what constitutes each

type of mark: "(1) arbitrary or fanciful (such as KODAK); (2) suggestive (such as

COPPERTONE); (3) descriptive (such as SECURITY CENTER); and (4) generic

(such as DIET CHOCOLATE FUDGE SODA)." *Freedom Card*, 432 F.3d at 472

(internal citations and quotation marks omitted).

Arbitrary/fanciful and suggestive marks are inherently distinctive, and

therefore, entitled to protection without proof of a secondary meaning. In contrast,

descriptive marks are entitled to protection only if they have a secondary meaning

---

[15] For the sake of brevity and ease of reading, the facts cited in the Court's analysis will not be followed by citations to the record. All facts cited are contained within the Statement of Facts section, *supra* Section II.

18

within the relevant market. *Checkpoint*, 269 F.3d at 282-83. "Secondary meaning is demonstrated where, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself. *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991) (internal citations and quotation marks omitted).

The Court finds that the conjunctive use of "Liberty" and a depiction of the Statue of Liberty in the home heating oil business is inherently distinctive. The word "Liberty" has no immediate or logical correlation with the home heating oil industry. The dominant term in "Liberty Discount Fuel" is "Liberty," which is where the Court must focus its attention when determining whether a mark deserves trademark protection. *Laurel*, 45 F. Supp. 2d at 483 (finding that "'Laurel,' used as the dominant portion of both parties mark, bears no logical or suggestive relationship to the actual characteristics of banking services," rendering it an arbitrary mark); *Dominion Bankshares Corp. v. Devon Holding Co., Inc.*, 690 F. Supp. 338, 345 (E.D. Pa. 1988) (finding "Dominion" was arbitrary because the word does not inform customers about the characteristics, functions, uses, or qualities of banking services); *see also Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004) (approving without comment the district court's instruction to the jury that the key term to focus on when determining whether the marks at issue

were protectable was the word, "Citizens"). This same analysis would apply to Liberty Oil and its logo, as well.

### 2. Does SMJ&J own the mark?

In order to evaluate the geographical extent of trademark rights, a district court must first determine who is the "senior user" and who is the "junior user." "The senior user is the first to adopt and use a mark anywhere in the country. The junior user is the second user, regardless of whether it adopts and uses a mark in a geographically remote location." *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F3d 311, 316 (3d Cir. 1999); *see also* 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:1 (4th ed. 2009) (hereinafter "McCarthy").

When two competitors use the same mark in the same area, "prior appropriation settles the question;" that is, the senior user's rights prevail over those of the junior user. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415, 36 S. Ct. 357, 361, 60 L. Ed. 713 (1916) ("Tea Rose" case). However, if the two users employ the mark in geographically distinct regions, "prior appropriation is legally insignificant; unless, . . . the [junior user] has selected the mark with some design inimical to the interests of the [senior] user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like." *Id.* Thus, a senior user may not "monopolize markets that his trade has never reached" because trademark rights "grow out of use, not mere adoption." *Id.* at 416, 36 S. Ct. at 361. So long as the junior user adopted the mark in "good faith," *United Drug Co. v.*

20

*Theodore Rectanus Co.*, 248 U.S. 90, 100, 39 S. Ct. 48, 52, 63 L. Ed. 141 (1918)

("Rectanus" case),[16] a senior user "may not be able to obtain relief against the junior user in

an area where [the senior user] has no established trade, and hence no reputation and no

good will." *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F2d 1383 (3d Cir. 1985).

Users operate in geographically remote markets if neither one's mark has penetrated

the market of the other. *United Drug*, 248 U.S. at 100; 39 S. Ct. at 52. Put another way, "[a]

'remote' territory is one where, at the critical date of the junior user's first use, the senior

user's mark was not known by customers in that territory, such that no one would have been

confused as to source." 6 McCARTHY § 26:4 (citing *ACCU Personnel, Inc. v. AccuStaff, Inc.*,

846 F. Supp. 1191, 1209-1211 (D. Del. 1994)).

"The good-faith junior user in a remote area is entitled to relief if, *at the critical date*

*of its first use of the mark*, the senior user's mark was unknown to customers in the area."

*Laurel Capital*, 45 F. Supp. 2d at 482 (citing *Natural Footwear*, 760 F.2d at 1397) (emphasis

added). The Third Circuit has yet to decide whether a junior user's prior knowledge of a

senior user's trademark, by itself, compels a finding of bad faith, or whether a junior user's

prior knowledge of the senior user's mark is just one factor of many to consider. *Lucent*

*Info. Mgmt., Inc.*, 186 F.3d at 318 ("[W]e have not decided whether a junior user's

---

[16] Together, these two Supreme Court cases are known as the *Tea Rose-Rectanus* cases which govern the territorial rights between senior and junior users of unregistered trademarks under federal common law. The cases were factually similar, except in *United Drug*, the senior user's product actually entered the territory of the junior user with goods bearing the conflicting mark. Of note, in both cases, the Supreme Court dealt with "inherently distinctive, common law marks." *A.J. Canfield*, 808 F.2d at 295 n.4. The Third Circuit has explicitly rejected Justice Holmes's concurring opinion in *Hanover Mills* that if a protected mark "is good in one part of the state, it is good in all." *Jacobs v. Iodent Chemical Co.*, 41 F.2d 63 (3d Cir. 1930).

knowledge of the senior user's use of a mark is sufficient to attribute bad faith adoption of the mark"). However, at least three district courts have used the junior user's prior knowledge as merely one factor in the good faith analysis. *See, e.g., MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 407 (D.N.J. 2008); *Commerce Bancorp, Inc.*, 285 F. Supp. 2d at 500; *ACCU Personnel, Inc.*, 846 F. Supp. at 1211. The burden is on the junior user that it acted in good faith. "The critical date to test good faith is the date of the junior user's first use." 6 MCCARTHY § 26:10 (4th ed. 2009).

Because this is Liberty Discount's motion for summary judgment, Liberty Discount is seeking to permanently enjoin Liberty Oil from entering New Jersey, and Liberty Discount, as the junior user, bears the burden of showing good faith, the Court must draw all reasonable inferences in favor of Liberty Oil, the senior user.[17]

There is no doubt that Liberty Discount sold and delivered home heating oil in New Jersey in 1994, well before Liberty Oil did sometime after the 2007 meeting at Perkins Pancake between the owners of SMJ&J and NRG. However, when precisely did Liberty Discount adopt the Statue of Liberty mark? This question is significant because SMJ&J's operation as Liberty Discount alone does not entitle SMJ&J to trademark protection in New Jersey. It must show both actual business operations and simultaneous use of the mark in those operations before it can obtain trademark protection. However, there is some

---

[17] As will be discussed more fully below, Liberty Oil is the senior user because as early as 1946, it was using the name Liberty Oil in conjunction with the Statue of Liberty mark. There is also evidence that after 1946, Liberty Oil continuously used the name and mark in its business in Pennsylvania. Liberty Oil's use of the mark was well before SMJ&J's which was sometime in 1999 or 2000.

22

ambiguous evidence that SMJ&J may have adopted the Statue of Liberty logo after learning of Liberty Oil's existence.

Wenger's deposition testimony indicates that sometime in 1999 or 2000 Wenger learned through his general manager that Liberty Oil might be for sale. However, after he instructed his general manager to make further inquiries, he learned that Liberty Oil was not, in fact, available for sale. There is no other evidence regarding this potential transaction. The Court cannot glean from the record whether Wenger ever saw the Statue of Liberty logo when he heard that Liberty Oil might be for sale or whether everything was purely by word-of-mouth through his general manager.

Furthermore, no one from Liberty Discount can state with any specificity when Liberty Discount began to employ the Statue of Liberty Mark prior to sometime in 1999 or 2000. Carl Cooper stated in his deposition that Liberty Discount never used the Statue of Liberty prior to SMJ&J's purchase of the company in 1994,[18] nor did SMJ&J adopt the logo in the two years after the purchase while Cooper stayed on.

---

[18] Greg Hill, a delivery truck driver for Liberty Discount, swore in an affidavit that beginning in 1982, he was a driver for Cooper's Sale and Service. When Cooper decided to separate the full service side of the business from the discount side, Cooper renamed the discount side, Liberty Discount Fuel. "To the best of [Hill's] recollection, since Carl Cooper started doing business as 'Liberty Discount Fuel,' the Statue of Liberty was used [by] him as part of the logo." (Hill Aff., Doc. 23, Ex. 5, ¶¶ 6-10). The affidavit does not indicate when the business was bifurcated and does not provide any temporal proximity

Affidavits are of less value than depositions because "[i]nherently[,] depositions carry an increased level of reliability. Depositions are adversarial in nature and provide the opportunity for direct and cross-examination. Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (internal citations omitted). In any case, because the testimony of Hill and Cooper conflicts, the Court must make a credibility determination at trial to resolve this factual conflict.

Liberty Discount very well may have adopted the Statue of Liberty logo before 1999, and Wenger's inquiry into Liberty Discount's availability for sale may have occurred in 2000. However, the Court simply cannot determine that Liberty Discount acted in good faith based on such an unclear record. In fact, it cannot even begin the good faith analysis because even if Liberty Discount did know of Liberty Oil's existence and mark, it would be only one, albeit very important, factor to consider. As the case stands now, it would be entirely inappropriate to award summary judgment on the basis of possible scenarios instead of actual events.

For Liberty Discount to prevail at trial, it must show that although it was the junior user of the mark, its adoption and use of the mark were undertaken in good faith, which under applicable law means that the adoption was without knowledge of Liberty Oil's use of the mark. Liberty Discount also must show that it meets the other indicia of good faith set forth in *Hanover Star*, namely "some design inimical to the interests of the [senior] user." *Id.* at 416, 36 S. Ct. at 361.

The Court notes that if a junior uses can show that it adopted the mark in good faith, a senior user may show it is entitled to protection in a particular region or market in three ways: (1) market penetration in a particular market, (2) reputation in a particular market, or (3) a "zone of natural expansion" extending into a particular market.[19] *Laurel Capital*, 45 F.

---

[19] While the Third Circuit has adopted the market penetration test set forth in *Natural Footwear*, it has not addressed explicitly whether a senior user can show entitlement to protection under the "reputation" or "zone of natural expansion" theories. A number of district courts have assumed the validity of these theories and have applied them. *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389 (D.N.J. 2008), *Commerce Bancorp, Inc. v.*

entitled to the adoption of the zone of natural expansion theory, and (2) if so, how it meets the requirements of the theory.

### 3. Is NRG's use of a similar mark likely to create confusion concerning the origin of SMJ&J's goods or services?

A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. Freedom Card, Inc., 432 F.3d at 470. "[T]he [ ] standard for determining trademark infringement under the Lanham Act is the likelihood of confusion[ ]," not "possibility of confusion." A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 205 (3d Cir. 1999). However, "[a]ctual confusion is one of the most reliable indications of the likelihood of confusion, so long as the confusion is causally related to the use of similar marks." Laurel Capital, 45 F. Supp. 2d at 494. Because SMJ&J has yet to establish good faith, the Court will not address this element at this time.

### 4. Conclusion

Because SMJ&J has failed to establish it is entitled to trademark protection in the areas of New Jersey in which Liberty Discount operates, the Court will deny its motion for partial summary judgment and for a permanent injunction.

### B. Defendant's Motion for Partial Summary Judgment

### 1. Is NRG's mark valid?

Based on the Court's discussion of the validity of SMJ&J's mark as expressed in Liberty Discount, there is little need to discuss the validity of NRG's mark as expressed in

25

Liberty Oil. Like Liberty Discount, Liberty uses the word, "Liberty" along with a depiction of the Statue of Liberty as its logo. The Court finds NRG's logo distinctive and valid, meriting trademark protection because "Liberty" is not often related to home heating oil and is capable of identifying its products as coming from a specific source. See Laurel, 45 F. Supp. 2d at 483.

## 2. Does NRG own the mark?

NRG has submitted evidence that since Liberty Oil's inception in 1925, it has been engaged in the buying and selling of oil. At least since 1946, as testified to by Rita Lotz, Liberty Oil has been using the Statute of Liberty. Corporate documents also reflect the use of the name Liberty and Statue of Liberty in connection with the home heating oil business since at least the 1986 when Klotz purchased Liberty Oil from Rita Lotz. Klotz testified that at that time, Liberty Oil had approximately eleven delivery trucks, and almost all bore the Statute of Liberty logo in addition to saying, "Liberty Oil Co." He also remembered seeing the mark since the 1970s when he lived in Lehighton. It is quite clear that NRG is the senior user of the mark generally, but the question remains as to the extent of NRG's territorial rights.

The Court is unpersuaded by NRG's argument that because Liberty Oil's mark is inherently distinctive, Natural Footwear is inapplicable to this case in light of Two Pesos. The central inquiry in Two Pesos was whether an inherently distinctive but unregistered mark must also have a secondary meaning before being entitled to trademark protection.

That is not the issue here, and the Supreme Court did not address any other issue.

Furthermore, NRG's reliance on an isolated statement in *A.J. Canfield* is misplaced. "If we

hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for

trademark protection at least in those geographic and product areas in which the senior

user applies it to its goods." 808 F.2d at 297. The Court has no argument with this

statement. However, this statement must be clarified: though an unregistered mark is

entitled to protection, that mark must been used in commerce[18] and its use must not have

been *de minimis. Natural Footwear*, 760 F.2d at 1394 ("the trademark of a prior user should

be protected from infringement by a subsequent user of the same mark only in areas where

the prior user has established a market for its goods.").

Therefore, the *Natural Footwear* test is perfectly applicable to determine whether

NRG is entitled to trademark protection in Lehigh, Monroe, and Northampton Counties.[19]

Even cases on which NRG heavily relies have recognized the continuing vitality of *Natural

Footwear* test for market penetration of unregistered marks. *See, e.g., Laurel* and *ACCU*,

(both decided after *A.J. Canfield* and *Natural Footwear*). See also *Lucent*, 186 F3d at 316

---

[18] Lanham Act § 45, 15 U.S.C. § 1127 ("The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."). McCarthy notes that this 1989 Amendment to the Lanham Act "substantially raises the quantum of use needed to satisfy the statutory definition of 'use' and will accordingly influence the determination of the quantity and quality of sales needed to constitute penetration into a territorial market." 6 McCarthy § 26:15 (4th ed. 2009).

[19] In *Natural Footwear*, the senior user had an unregistered mark and the junior user obtained a federal registration. However, *Natural Footwear* is also an appropriate test to use when the two users enter a previously "unoccupied territory." That is, no one else with the same mark has entered the market previously. 6 McCarthy § 26:13.

statement. However, this statement must be clarified: though an unregistered mark is entitled to protection, that mark must been used in commerce[20] and its use must not have been *de minimis*. *Natural Footwear*, 760 F.2d at 1394 ("the trademark of a prior user should be protected from infringement by a subsequent user of the same mark only in areas where the prior user has established a market for its goods.").

Therefore, the *Natural Footwear* test is perfectly applicable to determine whether NRG is entitled to trademark protection in Lehigh, Monroe, and Northampton Counties.[21] Even cases on which NRG heavily relies have recognized the continuing vitality of *Natural Footwear* test for market penetration of unregistered marks. *See, e.g.*, *Laurel* and *ACCU*, (both decided after *A.J. Canfield* and *Natural Footwear*). See also *Lucent*, 186 F3d at 316 ("the *Natural Footwear* test . . . measures the extent of a senior user's actual use and zone of expansion.").

To determine whether an actor has sufficiently penetrated a market to avail itself of protection for its mark, the Court must consider the following four elements: "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the

---

[20] Lanham Act § 45, 15 U.S.C. § 1127 ("The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."). McCarthy notes that this 1989 Amendment to the Lanham Act "substantially raises the quantum of use needed to satisfy the statutory definition of 'use' and will accordingly influence the determination of the quantity and quality of sales needed to constitute penetration into a territorial market." 6 MCCARTHY § 26:15 (4th ed. 2009).

[21] In *Natural Footwear*, the senior user had an unregistered mark and the junior user obtained a federal registration. However, *Natural Footwear* is also an appropriate test to use when the two users enter a previously "unoccupied territory." That is, no one else with the same mark has entered the market previously. 6 MCCARTHY § 26:13.

potential number of customers; and (4) the amount of product advertising in the area."
*Natural Footwear*, 760 F.2d at 1398. The senior user bears the burden of showing sufficient
market penetration and must show a "clear entitlement" to protection of its trademark in a
particular market. *Lucent*, 186 at F.3d at 316 (citing *Natural Footwear*, 760 F.2d at 1397).

It is important to establish the appropriate time frame for determining the status of
Liberty Oil's market penetration. The evidence of record shows that Liberty Discount
entered the markets of Lehigh, Monroe, and Northampton Counties at the latest in 1996
within two years of Cooper's sale of Liberty Discount to SMJ&J, but as early as "the mid-
1980s." (Cooper Dep. at 19:2-21:12). As stated above, the earliest that Liberty Discount
can show that it adopted the Statue of Liberty logo is in 1999 or 2000. Before NRG will be
entitled to trademark protection, NRG must show that Liberty Oil had sufficiently penetrated
those markets before Liberty Discount's entry and use of the contested mark. NRG has not
established this due to lack of evidence and the existence of genuine issues of material fact.

The only evidence of volume of sales is a customer list from 2000, which is, at best,
within the same time frame that SMJ&J established a market presence in the counties in
question and did so using the Statue of Liberty mark. NRG also offered a Liberty Oil
Company History for Northampton County and Lehigh County. However, there was a single
account with activity in August 1994 in Whitehall, Pennsylvania (Lehigh County), and a
handful of transaction histories in January 27, 1998. The earliest account activity in
Northampton County is dated February 1998, and there is no NRG customer list for Monroe

County. Finally, the absolute number of accounts in Northampton County and Monroe County (approximately thirty) does appear to be "minimal." Based on this evidence, the Court cannot determine with any degree of certainty that Liberty Oil was the first market penetrator or that it penetrated the market with any substantiality.

Otherwise, the only other evidence consists of Norwood Klotz's and Rita Lotz's vague and imprecise deposition testimonies. Ritz Lotz's affidavit indicates that between 1946 and 1986, Liberty Oil delivered to Monroe and Northampton Counties, but she does not mention Lehigh County. However, the affidavit is silent as to the volume of sales recorded in those counties. What Klotz did recollect was not particularly helpful to NRG. He stated that he "definitely delivered to Northampton," and remembered trucks delivering to certain cities in Monroe (e.g., Stroudsburg, perhaps Tannersville), but he also admitted that Liberty Oil was focused in Carbon and Schuylkill Counties, and that in comparison to business in those two counties, business in other counties was "minimal." Human memory is subject to fade as the years pass, so for Klotz to remember with any kind of accuracy the sales figures of Liberty Oil from thirty to forty years in the past in specific counties in Pennsylvania may be extremely difficult, but the Court cannot award NRG summary judgment on the basis of incomplete memory. Furthermore, Troy Ahner was unable to identify more than a single account located in Northampton County when presented with a Liberty Oil customer list, and the best the owners of NRG can swear is that Liberty Oil operated in Monroe and Northampton before 2007 when NRG bought Liberty Oil from Klotz.

Second, there was no evidence of growth trends other than Klotz's testimony that between 2000 and 2007, business declined 30% generally, which is again outside of the relevant time frame and not specific to the three counties at issue.

Third, the record is devoid of any evidence as to the actual number of customers in these counties relative to the potential number of customers. Taking the only numbers available, NRG's approximately thirty accounts compared to SMJ&J's 11,000 accounts shows that the actual number of NRG's customers is negligible when compared to a minimum potential number of customers of 11,000.[22]

Finally, NRG's product advertising of Liberty Oil is unimpressive. Aside from testimony from Klotz that Liberty Oil often advertised in the *Morning Call*, *Pottsville Republican*, the *Times-News*, and other publications, there is scant evidence of advertising in Lehigh, Monroe, and Northampton Counties, in particular. The *Pottsville Republican* and *Times-News* do not appear to reach the counties at issue. While the *Morning Call* does reach the counties at issue, the evidence does not show what portion of the advertising was directed towards these three counties, how often these ads ran, or how long they ran. Klotz could not remember how much he had spent on total advertising, let alone advertising in these specific counties.

---

[22] This reasoning does not account for any population swings which may have occurred between the 1970s and today or changes in consumer habits. For instance, Klotz testified that the late 90s were the peak of fuel oil business because beginning in the 2000s, people shifted to gas or coal heating because of surging oil prices, meaning the potential number of customers for fuel oil might have changed accordingly. Thus, the Court's reasoning should be taken only for the proposition that NRG's actual number of customers was a mere fraction of what it could have been.

The omission of Northampton County in the 1991 *Pottsville Republican* advertisement of areas which Liberty Oil served and in the draft which Klotz had edited a few years earlier - whether inadvertent or otherwise - is also telling, though the article did indicate that Liberty Oil served Lehigh and Monroe Counties. Finally, Liberty Oil's late additions of Lehigh, Monroe, and Northampton Counties to its website weighs against finding sufficient market penetration.

Though the deficiency in evidence alone would preclude an award of summary judgment in favor of NRG, SMJ&J has set forth its own evidence that creates genuine issues of material fact. At least three employees of SMJ&J have testified that before 2010, they had never seen Liberty Oil trucks in these three counties. Though this testimony is of limited value and is somewhat self-serving, it does cast doubt on the extent of Liberty Oil's operations in the counties in controversy. Because of the nature of the relief of permanent injunctions[23] and the burden of proof it bears, NRG will have to come forth with much more concrete evidence before the Court will award it relief.

### 3. Likelihood of confusion?

The Court will not address this element because NRG has not shown that it is the undisputed senior user of the mark in Lehigh, Monroe, and Northhampton Counties in Pennsylvania.

### 4. Conclusion

---

[23] In moving for partial summary judgment, NRG did not brief the necessary elements of a permanent injunction. As such, the Court will not address the remaining elements necessary to prove entitlement to a permanent injunction.

Because NRG has failed to meet its burden of proving entitlement to trademark protection in Lehigh, Monroe, and Northampton Counties, it has not shown "actual success on the merits" which would entitle it to a permanent injunction, thus precluding the award of summary judgment.

## V. Conclusion

For the foregoing reasons, the Court will deny SMJ&J's motion for partial summary judgment with respect to the use of "Liberty" and the Statue of Liberty in mark in Hunterdon, Morris, Sussex, and Warren Counties in New Jersey because it has failed to establish when and whether it adopted the mark in good faith. Similarly, the Court will deny NRG's motion for partial summary judgment with respect to SMJ&J's use of "Liberty" and the Statue of Liberty in Lehigh, Monroe, and Northampton Counties in Pennsylvania because it has failed to establish its market penetration into those markets.

The primary reason that the Court is denying these cross-motions for partial summary judgment is that much of the evidence presented is based on testimony consisting of vague and hazy recollections. At trial, the Court will expect the parties to present much more specific evidence[24] than was submitted in these cross-motions. Failure to do so may result in neither side obtaining the relief it seeks. While the Court understands that the parties are not large conglomerates operating on a national scale and that their records may

---

[24] *I.e.*, dates expressed in months and years, as opposed to some time in a particular decade.

not be complete or wholly digitized, it cannot excuse them from the burden of proving their

respective cases.  A separate Order follows.

Robert D. Mariani
United States District Judge

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SMJ&J, INC.                          :
                                     :
                    **Plaintiff**    :
                                     :
v.                                   :   **3:11-CV-0008**
                                     :   **(JUDGE MARIANI)**
NRG HEAT & POWER, LLC                :
                                     :
                                     :
                    **Defendant**    :

## ORDER

**AND NOW**, **THIS 2ND DAY OF OCTOBER, 2012,** upon consideration of Plaintiff's

Motion for Partial Summary Judgment (Doc. 19), Defendant's Motion for Partial Summary

Judgment (Doc. 20), and all accompanying briefs, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 19) is **DENIED**.

2. Defendant's Motion for Partial Summary Judgment (Doc. 20) is **DENIED**.

3. A telephone scheduling conference will be held on the 22nd day of October, 2012

   at 3:00 p.m. to set a date for a trial on the issue of liability. Plaintiff's counsel is

   responsible for placing the call to chambers at (570) 207-5750. All parties should

   be prepared to proceed before contacting the undersigned.

Robert D. Mariani
United States District Judge